UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

```
---------------------------x
UNITED STATES OF AMERICA,  :
           Plaintiff       :
                           :
                           :
vs                         :Criminal Action:1:11-CR-93
                           :
NICHOLAS DIMITRIS,         :
            Defendant.     :
---------------------------x
```

Tuesday, November 26, 2013
Asheville, North Carolina

The above-entitled action came on for a Sentencing Hearing Proceeding before the HONORABLE MARTIN K. REIDINGER, United States District Judge, in Courtroom 1 commencing at 10:22 a.m.

**APPEARANCES**:

On behalf of the Government:
DON GAST, Esquire
Office of the United States Attorney
100 Otis Street
Asheville, North Carolina 28801

On behalf of the Defendant:
RICHARD G. BELSER, Esquire
Belser & Parke
17 N. Market Street, Suite 1
Asheville, North Carolina 28801

# I N D E X

Page
Reporter's Certificate......................30

**P R O C E E D I N G S**

THE COURT: The next matter we have is the case of United States versus Nicholas Dimitris, which is before the Court for the sentencing of the defendant pursuant to his plea of guilty on the charge of conspiracy to commit theft, embezzlement or misapplication by a bank officer or employee, in violation of 18 U.S.C., Sections 371 and 656.

Mr. Belser, good morning.

MR. BELSER: Good morning, sir.

THE COURT: I guess it's still morning but not by much. Is the defendant prepared to proceed?

MR. BELSER: Yes, sir.

THE COURT: Mr. Gast, is the government prepared to proceed?

MR. GAST: Yes, Your Honor.

THE COURT: In preparation for this hearing I have seen the defendant's objections to the presentence report, I've seen the sentencing memorandum which includes the withdrawal of a number of those objections, I've seen the letters of support that have been submitted on behalf of the defendant, and I have seen the government's motion for downward departure. Are there any other items that have been submitted in anticipation of this hearing? Any for the defendant?

MR. BELSER: No, sir.
THE COURT: Any for the government?
MR. GAST: No, Your Honor.
THE COURT: Mr. Dimitris, I need for you to stand, please. Do you recall appearing before the magistrate judge on or about the 5th of December of 2011 for the purpose of entering a plea of guilty in this case?
THE DEFENDANT: Yes, sir.
THE COURT: Do you remember being sworn in or placed under oath at that time?
THE DEFENDANT: Yes, sir.
THE COURT: Do you remember answering the questions of the magistrate judge?
THE DEFENDANT: I do.
THE COURT: Is it correct that at that time you signed a Plea Inquiry Form indicating that your answers were true and correct at the time they were given?
THE DEFENDANT: Yes.
THE COURT: Were your answers, in fact, true and correct when you answered the questions of the magistrate judge?
THE DEFENDANT: Yes.
THE COURT: If I asked you all the same questions here today, would your answers be the same?

THE DEFENDANT: Yes.

THE COURT: Mr. Belser, were you in attendance at the Rule 11 hearing for your client?

MR. BELSER: Not the original one, Your Honor. Ron True was his lawyer at that time. After Mr. True's death I was appointed to represent Mr. Dimitris. Out of an abundance of caution Judge Howell suggested that we reaffirm the plea in a new Rule 11, and I was present for that.

THE COURT: Are you satisfied that your client fully understood the questions that were asked of him by the magistrate judge at the Rule 11 hearing?

MR. BELSER: Yes, sir.

THE COURT: Are you satisfied that your client has fully understood the questions that I've asked him here today?

MR. BELSER: Yes, sir.

THE COURT: Mr. Dimitris, did you answer those questions the way that you did and are you pleading guilty because you did in fact commit the crime with which you are charged?

THE DEFENDANT: Yes, sir.

THE COURT: Is your plea of guilty the result of any threat or force or promise, other than promises that may be in your plea agreement?

THE DEFENDANT: No, sir.

THE COURT: Are you pleading guilty voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: In this case you're pleading guilty pursuant to a plea agreement. In that plea agreement you have agreed, and the government has agreed, to certain facts and certain factors for sentencing. Under the law I am not required to accept those facts or factors simply because both sides have agreed. If I decline to accept any of those facts or factors in my sentencing decision you will not have the right to withdraw your plea. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Is it still your plea to plead guilty in this matter?

THE DEFENDANT: Yes, sir.

THE COURT: Based upon the representations made to the Court and the answers given by the defendant at the Rule 11 hearing before the magistrate judge, the Court finds, concludes and confirms that the defendant's plea is knowingly and voluntarily made and that the defendant understands the charges, potential penalties and consequences of his plea.

Mr. Belser, does the defendant stipulate that there is a factual basis to support his plea of guilty

entered in this case and, further, that the Court may accept the evidence as set forth in the presentence report as establishing such factual basis?

MR. BELSER: Yes, sir.

THE COURT: Mr. Gast, does the government so stipulate?

MR. GAST: Yes, Your Honor.

THE COURT: Based on the stipulation of the parties and the evidence as set forth in the presentence report, which report was previously reviewed by the Court, and based upon the defendant's admission of guilt, the Court finds, concludes and confirms that there is a factual basis for the defendant's plea. Accordingly, the Court confirms the magistrate judge's acceptance of the defendant's guilty plea and this court accepts the defendant's plea of guilty, finds the defendant is guilty, and enters thereon a verdict and judgment of guilty.

Mr. Dimitris, there is a document that has been prepared and I'm holding up a copy of it here. I don't know if you can see it from your table, but in the upper left-hand corner it has a caption that reads "United States of America versus Nicholas Dimitris." I see that your attorney is showing you a copy there at your table. On the upper right-hand side it has a title that reads

"Presentence Investigation Report." Have you seen this document before today?

THE DEFENDANT: Yes, sir.

THE COURT: Have you had an opportunity to review it with your attorney?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand the contents of that document?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Belser, have you had an opportunity to review the presentence report with Mr. Dimitris?

MR. BELSER: Yes, sir.

THE COURT: Are you satisfied that Mr. Dimitris understands the contents of the presentence report?

MR. BELSER: Yes, sir.

THE COURT: Thank you. Mr. Dimitris, you may take your seat.

With regard to the defendant's objections to the presentence report. Mr. Belser, do I understand or do I correctly read your recent filing that you have withdrawn those objections? Is that correct?

MR. BELSER: I've withdrawn all of the objections. Yes, sir.

THE COURT: So, are there any issues regarding the

presentence report that need to be addressed? Any on behalf of the defendant?

MR. BELSER: No, sir.

THE COURT: Any on behalf of the government?

MR. GAST: No, Your Honor.

THE COURT: Therefore, the Court will accept the presentence report as written and, based thereon, will find that the total offense level in this case is 21 and that the criminal history category in this case is one. Based on that total offense level and criminal history category the Court will conclude, as a matter of law, that the guideline range applicable in this case is for 37 to 46 months of incarceration.

Mr. Belser, did I calculate that correctly?

MR. BELSER: Yes, sir.

THE COURT: Do you agree, Mr. Gast?

MR. GAST: Yes, Your Honor.

THE COURT: The next thing I would want to move on to is the government's motion for downward departure. Mr. Gast, I have -- I've read your motion. I also presided over the trial at which Mr. Dimitris testified, so I'm familiar with his testimony. Do you wish to be heard any further with regard to the government's motion for downward departure?

MR. GAST: No, Your Honor, thank you.

THE COURT: Based on the factors as set out in the government's motion for downward departure, and based upon the Court having conducted the trial at which Mr. Dimitris testified, the Court will find that the defendant has provided substantial assistance to the government in the investigation and prosecution of others and that the nature and extent of that cooperation is such as to warrant a downward departure the equivalent of three offense levels. Therefore, the Court will sentence in this matter with reference to an offense level of 18, rather than 21 as found, and that would yield an equivalent guideline range of 27 to 33 months of incarceration.

Mr. Belser, did I calculate that correctly?

MR. BELSER: You did calculate it correctly, yes, sir, but I was going to ask the Court for a further departure asking you to value his assistance a little more generously than the government. I would ask you to grant the motion for downward departure but hear me out on why it should be somewhat less than that.

THE COURT: Do you want to be heard on that separately or as part of your argument as to an appropriate sentence?

MR. BELSER: As part of the appropriate sentence argument.

THE COURT: Okay. Well I will leave, then, open the issue of the degree of a departure for that argument to allow you to make that argument. Mr. Belser, with that, let's move on to the question of the appropriate argument -- appropriate sentence arguments. Mr. Belser, what sentence should I impose in this case?

MR. BELSER: If, Your Honor, please. I would ask the Court to strongly consider the 37 letters of reference, Counsel letters, that I submitted on behalf of Mr. Dimitris as bearing on the 3553(a) factors and to fashion a sentence as close to something that leaves no incarceration or close to Mr. Smith's level as you possibly can.

As you can see from those letters, the history and characteristics of Mr. Dimitris are exemplary. He's lived an essentially blameless life for some 40-odd years. He's been in the ministry for 20 years. He's still actively involved as the pastor here in Asheville at the C Three church. There's several folks from the church here in court to support him. Dr. Frank and Shirley Harvey, who is his immediate pastor and the church overseer; Allen and Jolene Waite who are friends and board members of his church are here. Jodi Stirewalt and Angela Devoine are congregational members.

He has been engaged in the ministry since the age

of 19. He's done prison ministries. He's done ministries in Russia. As you can see from those letters, he has touched many, many lives very, very positively. All of the letters continually reflect the same descriptions of Mr. Dimitris: "Selfless devotion in helping others and in building a church." "Integrity and honesty." "Strong moral beliefs and positive action." That's from the first letter, Exhibit No. 1 from Harrison Guess. "A person with a giving heart." "Full of grace, mercy and very giving," that's from Brenda Vosverett. The second letter: "A high standard of integrity and a man of honor." "A man of right standing who chose to be an overcomer with the help of his Savior." All those descriptions are consistent throughout the 37 letters that I submitted.

So I'd say that the history and characteristics of Mr. Dimitris are pretty unique in terms of having somebody come before the Court with that much positive community support and that much of a good life behind him. He obviously made some serious mistakes in judgment here trying to keep his own business alive. He's lost all of his assets and all of his business. His net worth is negative by hundreds of thousands of dollars, as reflected by the presentence report.

He has cooperated continuously with law

enforcement from the very beginning which, I suggest, is another factor in 3553(a) promoting respect for the law. He quickly reaffirmed his guilty plea when I was appointed. He met many times with the government lawyers and the agents. He spent many hours actually preparing for trial. He helped them a great deal in their prosecution of Mr. Vinson. I saw his testimony in court that day, having sat through on the various lengthy debriefings, and I thought he did extremely good job. I didn't think the defense lawyer was able to score any points on him. He was a very credible witness, and I think he was a strong witness for the government.

So I'd ask the Court to consider all those things and to fashion a sentence that allows him to go back to doing what he does and has done so well for years, and that is to serve the community. I don't think anything would be served by locking him up for any lengthy period of time. He can benefit the community, as he has done in the past, by serving God and his church and thereby help everyone out, rather than be a burden on society in prison.

If you would take those factors under 3553(a) and also value somewhat more generously his cooperation with the government, I'd ask the Court to come down to the level that I previously spoke about. The plea agreement

originally contemplated the government would recommend the bottom of the -- the low end of the guideline range. Since that started off at 37 and they're coming down to 27, that's really a ten-month difference for a very, very substantial bit of assistance. So I'd ask the Court, since you saw all the trial, you saw his testimony, you saw how it fit in, I'd ask the Court to value that assistance and that departure substantially more than the government would and to come down to a range -- like I said, it would possibly not include incarceration at all but, if it does, something that would be closer to Mr. Smith's level.

THE COURT: Thank you, Mr. Belser.

Mr. Gast, what's the position of the government?

MR. GAST: Thank you, Your Honor. Your Honor, the government recommends a sentence of 27 months, which is the bottom of the guideline range, as reflected by the 5(k) motion. I don't agree with -- I don't disagree with Mr. Belser on any of the matters that he's described to the Court in terms of his level of cooperation and the timing with which he did so. He cooperated early and fully. Your Honor saw him testify. I don't need to comment about that, other than to say that the government agrees that he did a very good job.

I'll be candid. The assessment of Mr. Dimitris'

5(k) really was a matter between Mr. Savage and our management because, as you might recall, Mr. Dimitris was Mr. Savage's witness at trial and he spent all the time preparing him. I've spoken with Mr. Savage about it and, basically, where we started is actually at his plea agreement before we weighed that as well with the 5(k) motion. Your Honor might see from the second term of the plea agreement that, in addition to capping his amount of loss that was known at the time, the $825,000, which served him very well in a manner I'm going to describe in a minute, but the government also agreed not to prosecute him for any other loan activity in the district at -- during that period of time. That's item two in the plea agreement.

Your Honor has seen this, no doubt, from the bench and also from when you were in private practice that in these white collar cases, at the very beginning there's almost always the tip of the iceberg and then you just -- there's more and more below the surface. And as more of it surfaces, the more we reveal, of course, it gets bigger exponentially. The Court, of course, saw that in this case that all these cases had tendrils that had tendrils. As such, it is routine in these white collar cases that the people who come in and plead early not only get the benefit of, you know, saying they got to

come in early and they helped the government very early and therefore are more deserving of 5(k)s, but they also get the benefit of locking in on the basis of what the government knew at the time.

Mr. Dimitris, perhaps, illustrates that more than anyone else in this case because, I dare say, had Mr. Ellis known about Mr. Dimitris what we know, he probably wouldn't have included item two in the plea agreement. Because in addition to -- you know, this $825,000 loss, simply reflects the Somily transactions that were in the *quid pro quo* section of the indictment about which we didn't really speak very much in the Vinson trial because Mr. Vinson was not very directly involved in that. But what that excised is the two Dion loans that were part of the lot loan program.

So, when one figures that in, that's an additional $1.2 million of loss to both -- let's see, 600 to Pisgah Community Bank and then 640, roughly, to Bank of Asheville on those two loans. And as Your Honor will recall from the testimony, those were loans for which Mr. Dimitris was receiving payments, was receiving kickbacks, for serving as straw borrowers in those loans. But what paragraph two in the plea agreement also did -- and I can't speak for Mr. Ellis, since he's no longer here and whether he did so intentionally or

unintentionally -- it inoculated the defendant from loss with regard to the Spicewood Development which Your Honor has not heard anything about, really, because -- except tangentially there was some testimony of that.

Essentially, Spicewood was its own -- that was a development that Mr. Dimitris was managing and it was one for which he was doing his own straw loan regime prior to even the lot loan program. There's at least another million dollars' loss there associated with the straw loans there, or at least intended loss. At the time, Spicewood was barely a blip on the government's radar. Of course, with the development of the case now, we fully, or more fully, explored that and realized that there was more iceberg below the surface than we realized.

All that to say is that because Mr. Dimitris came in when he did -- and, of course, I'm not suggesting that he should not get credit for it, he actually should, and has and will. But let's be clear that where we're starting from when we're asking for a 5(k) departure is now that we have fully digested the facts of this case, you know, the loss amount that we're talking about with Mr. Dimitris is in excess of $2 million.

Therefore, using that as a potential starting point of where he could have been but for the plea

agreement, he'd be looking at a range of 57 to 71 months. And 5K1.1 directs or recommends, at least, that both the Court and the government take that into consideration when making a 5(k) recommendation. So, while ten months may seem on the stingy side because he did fully cooperate and confess, again, I agree with everything Mr. Belser said about that. It's not really ten months. It's starting from -- he got, perhaps, the most, if not one of the most, generous plea agreements of anyone in this case. So the Court needs to fully appreciate and understand that.

The government also believes that Mr. Greenwood similarly benefited from coming in as early as he did. There was a lot about this case that we did not know of when Mr. Greenwood pled guilty. As such, it is perhaps unfortunate, at least from the government's standpoint, that Mr. Greenwood pled so early, and then we learned later just how much more he was involved with. Again, that's why it behooves every white collar defendant to come in early, and it certainly benefited Mr. Greenwood.

Now the government is -- I'm spending a little time on this with Your Honor because Mr. Greenwood's sentence is not the best benchmark in this case for the conduct. And it's probably no surprise if I tell the Court that, with respect, the government disagrees with

the sentence that Mr. Smith got. I'm sure I'm not surprising the Court with that relating those to Mr. Greenwood poses difficulties. I certainly understand that 3553(a), amongst other things, calls for the Court to try to avoid unwarranted sentencing disparities but I just ask the Court to bear in mind, in this and other sentencings, that using that touchstone is difficult. Perhaps disparities are more warranted than it might appear on its surface because of the benefits of the bargain they got in other contexts.

The government feels that 27 months is appropriate in this case and it takes into account fully his cooperation. His cooperation was full and complete. His conduct, however, was particularly bad. While he did not have a fiduciary duty to these banks like a Mr. Greenwood or like a Mr. Smith, he was receiving kickbacks. He was financially benefiting from serving as a straw borrower. He fully admitted to that and should get credit for accepting responsibility for that, unlike Mr. Smith, for example, who still has difficulty articulating why he's guilty. Mr. Dimitris has not had that problem but, you know, this is a situation where he was an active participant in bilking banks out of millions of dollars by using straw borrowers and financially benefited from doing so unlike, for example, Mr. Greenwood and

Mr. Smith who did not financially benefit except indirectly by keeping their jobs and keeping the banks afloat as long as they could.

So, we feel that 27 months, when compared to the 57 to 71 months, you know, that's approximately half, which is where we want to be when we have a fully cooperative testifying defendant. That's why we picked that touchstone and we feel that that's appropriate. Thank you.

THE COURT: Thank you.

Mr. Dimitris, you now have the opportunity to address the Court and to tell me anything that you feel I should know before I make my decision regarding your sentence.

THE DEFENDANT: First, Your Honor, I will say that I am sorry for my involvement in all of it, and I am sorry to every victim affected by it. It was wrong. I regret it. I accept responsibility for my part. I do want to ask Your Honor for mercy and significant consideration regarding my cooperation with the government and assistance and, as well, significant consideration, given the fact that I have not been able to speak to anything else except that which is specific to this case. I would like to ask Your Honor today if you would, in light of all these things, if you would

consider to allow me to remain responsible for my family, my wife, my children, and to maintain, as well, the ability to serve my church. Thank you, Your Honor.

THE COURT: Thank you, Mr. Dimitris.

Mr. Dimitris, I need for you to stand for the imposition of the sentence in your matter. Pursuant to the Sentencing Reform Act of 1984 and the case of *United States versus Booker*, it is the judgment of this court, having considered the factors noted in 18 U.S.C., Section 3553(a), that the defendant, Nicholas Dimitris, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 12 months, plus one day.

Now, with regard to the application of the factors for sentencing. Under the statute Section 3553(a) there are several factors. I will start -- and Mr. Gast anticipated my reasons in this regard and that is, I note in this case that the offense levels for the various defendants for whom presentence reports have been completed are essentially identical, even though they reflect very, very different degrees of involvement.

One of the ones for whom not only the presentence report has been completed but for whom the sentencing has been completed, albeit by another judge, is Mr. Greenwood. Mr. Gast argues that that is not a good

benchmark, but it still is a benchmark that I need to follow. Because when I have a situation like this where essentially all the defendants, regardless of the nature and extent of their involvement, essentially, end up with the same offense level, it tells me that the guideline range and the calculation of the guideline range is of relatively little advisory value.

So then I'm left with looking to the 3553 -- the factors under the statute, Section 3553(a). And part of that is I need to, in essence, assess a ranking of the defendants. Maybe that's a bad way to put it, but the statute says I have to avoid unwarranted sentencing disparities. In doing that, I have to look at the relative culpabilities of the participants in the sentencing. In doing that, I still have Mr. Greenwood, who is one of the persons of primary responsibility in this overall scheme. Therefore, it does set something of a benchmark, whether it was intended to be that or not.

Even if it was not originally intended to be a benchmark, I note that the government has now made a motion for a reduction of Mr. Greenwood's sentence. And that sort of reduction, just like what Mr. Gast says about 5K1.1, you start from where that defendant could have, should have been. And apparently, the government feels that, in light of good actions on the part of

Mr. Greenwood, the amount of his sentence needs to be reduced, and that's something that is a factor. It's certainly not the final factor, but it is a factor.

I look at the history and characteristics of this defendant. I look at what he's lost. I see the value of this defendant to the community. There are several factors here that call out for a probationary sentence. However, those, of course, are not exclusive. And one of the ones that I need to look at is a sentence that reflects the seriousness of the offense and affords adequate deterrence to criminal conduct of this nature. In other words, everybody else who's out there, whether a banker or a developer who deals with a lot of banks, I need to send a message to those people that if you participate in this kind of conduct not only is it going to result in ruining you financially; it is going to result in a period of incarceration. There is a big, big consequence for this sort of activity.

Here, it's not only serious wrongdoing but it was very harmful wrongdoing. Even though this defendant really just had one corner or one wedge of the pie, so to speak, it was conduct that did jeopardize two banks in our community that now have ultimately failed. That undermines the confidence of the public in our banking system in our local banks and that has a deleterious

effect upon our economy, both locally and nationally. It is something that has wide ranging harm not just to the builders and not just to bankers but beyond that. It limits the abilities of other banks to be able to participate in our economy, which limits the ability of other businesses to flourish in our economy. Those sorts of handicaps are the last thing that we need in our economy today.

I also take into account the fact that this defendant, in essence, profited from his wrongdoing. He received kickbacks, illegal kickbacks. Granted, he was trying to do this in order to salvage his own business as it was running into problems but, still, there was an element of the personal gain for this defendant.

Therefore, I have only come down to the sentence of 12 months, plus one day considering, first of all, the degree, nature and extent of the cooperation of the defendant for the government. I listened to the defendant's testimony at trial, and the defendant was a very good witness. He was very convincing and was, I believe, in some respects instrumental in the conviction of Mr. Vinson. I will deny the defendant's motion for a further departure under 5K1.1 because I believe that the government is in the position to assess how much the defendant's cooperation is worth. I believe that that's

still a substantial factor here that has brought this sentence down to the level of where I have set it in this case. For all of those reasons, for those varying reasons that pull in these different directions, I have assessed the sentence as I have announced previously.

It is ordered that the defendant be required to support all dependents from prison earnings while incarcerated, as outlined in the presentence report.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. Within 72 hours of release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release the defendant shall not commit another federal, state or local crime and shall comply with the standard conditions that have been adopted by the Court in the Western District of North Carolina.

In addition, the defendant shall comply with the following additional condition. The periodic drug testing mandated by the Violent Crime Control and Law Enforcement Act of 1994 is hereby suspended with regard to this defendant. The Court finds that this offense is not drug-related and that the defendant has no current or

past history of substance abuse.

It is further ordered that the defendant shall pay the United States a special assessment in the amount of $100.

The Court will leave open the issue of restitution under 18 U.S.C., Section 3663(a) for a period of 90 days, and we will address shortly how we're going to have the restitution hearing in this matter.

The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered and may order such payment in the future. It is further ordered that the victim's recovery is limited to the amount of their loss. The defendant's liability for restitution ceases if and when the victims receive full restitution.

The Court finds that the defendant does not have the ability to pay a fine or interest. Having considered the factors noted in 18 U.S.C., Section 3572(a), the Court will waive the payment of a fine and interest in this case.

Payment of the criminal monetary penalties shall be due and payable immediately.

The Court has considered the financial and other information contained in the presentence report and finds

that the following is feasible. If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment, payments shall be made through the federal Bureau of Prisons Inmate Financial Responsibility program. Upon release from imprisonment, any remaining balance shall be paid in monthly installments of no less than $50 to commence within 60 days after release until paid in full. Throughout the period of supervision the probation officer shall monitor the defendant's economic circumstances and shall report to the Court with recommendations, as warranted, any material changes that affect the defendant's ability to pay any court-ordered penalties.

Mr. Belser, are there any other issues regarding either the sentence or the judgment that need to be addressed?

MR. BELSER: Nothing with respect to the judgment. I would ask the Court to allow Mr. Dimitris to self-surrender. The government said it had no objection to that request.

I'd also ask the Court -- his wife, Heatherly, who is in court today, is pregnant and is due to give birth on January 21st. If there's any way you could order the Bureau of Prisons to make the reporting date sometime after that, he would certainly appreciate it.

THE COURT: Mr. Gast, what's the position of the government?

MR. GAST: We don't object to self-reporting. Off the top of my head, I don't know what the Court's discretion is as far as delaying self-reporting. I don't have an objection so long as it's within the Court's discretion to do that.

THE COURT: I will allow the defendant to self-report, there having been no problems during the period of release. What that means, Mr. Dimitris, is you will be notified as to when and where you will need to go in order to report for the beginning of this term of incarceration. I will also include that the report date be no sooner than February 1st 2014.

Anything else, Mr. Belser?

MR. BELSER: No, sir. Thank you.

THE COURT: Anything else for the government?

MR. GAST: No, Your Honor.

THE COURT: Mr. Dimitris, you have the right to appeal this sentence to the Fourth Circuit Court of Appeals on any grounds that you've not previously waived. You have pleaded guilty pursuant to a plea agreement. That plea agreement includes some waivers that may substantially affect your appeal rights. You will need to consult with your attorney as to what effect those

waivers may have. However, if you choose to appeal, you must file a written notice of appeal with the clerk of this court within a period of 14 calendar days following the date of the entry of the final judgment in this case. If you choose to appeal but do not have funds with which to appeal, you have previously been determined to be indigent and, therefore, you may appeal at government expense. Do you understand this right of appeal as I have explained it to you?

THE DEFENDANT: Yes, sir.

THE COURT: Well, with that, that will conclude this matter. Mr. Dimitris, I recognize how difficult this is for you, just as this whole matter has been difficult for a lot of people who have lost a lot of things and a lot of money and a lot of sleep and a lot of station in the community through all this. You know that probably even better than I do. I'm just an observer. In the end, there is a way that you can use this for something positive.

It's probably not obvious right now to you or anybody else, but I have confidence that you can do that and figure out what that is. I figure all those people back there who came here to support you can help you in making whatever that assessment is to figure out how it can be a positive. We wish you the best in doing that.

I trust -- I have all confidence we're never going to see you back here again.

THE DEFENDANT: That's right.

THE COURT: Okay. That concludes this matter.

MR. BELSER: Thank you, Your Honor.

(Off the record at 12:40 p.m.)

**CERTIFICATE**

I, Tracy Rae Dunlap, RMR, CRR, an Official Court Reporter for the United States District Court for the Western District of North Carolina, do hereby certify that I transcribed, by machine shorthand, the proceedings had in the case of UNITED STATES OF AMERICA versus NICHOLAS DIMITRIS, Criminal Action Number 1:11-CR-93 on November 26, 2013.

In witness whereof, I have hereto subscribed my name, this 3rd day of December 2013.

__/S/__Tracy Rae Dunlap___
TRACY RAE DUNLAP, RMR, CRR
OFFICIAL COURT REPORTER